IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2016

**STATE OF TENNESSEE v. BABY DASHEA NIX**

**Appeal from the Criminal Court for Sumner County**
**Nos. 60-2013, 540-2014    Dee David Gay, Judge**

———————————

**No. M2015-02270-CCA-R3-CD – Filed September 1, 2016**

———————————

The Defendant, Baby Dashea Nix, appeals as of right from the Sumner County Criminal Court's partial revocation of her effective twelve-year community corrections sentence.[1] The Defendant contends that the evidence presented at the revocation hearing was insufficient to establish that a violation of the conditions of her sentence occurred and that, therefore, the trial court abused its discretion. The Defendant also submits that she was not afforded due process because counsel failed to present the testimony of the Defendant's mother at the revocation hearing. Following our review, we affirm the trial court's partial revocation of the Defendant's community corrections sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Jill Z. Grim (on appeal), Hendersonville, Tennessee, and Stephanie A. Boiano (at hearing), Nashville, Tennessee, for the appellant, Baby Dashea Nix.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; L. Ray Whitley, District Attorney General; and Lytle Anthony James, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On June 10, 2013, the Defendant pled guilty in case number 60-2013 to burglary of a building other than a habitation and theft of property valued at $1000 or more but

---

[1] Because the terms probation or probationary sentence are often used by the parties, we feel it important to clarify that the Defendant received a community corrections sentence.

less than $10,000, both Class D felonies. See Tenn. Code Ann. §§ 39-14-103, -105, -402. She received concurrent, eight-year terms as a Range II, multiple offender, for these convictions. The judgment forms reflect that she was ordered to serve seven years and six months of this sentence in the Community Corrections Program; that a third count was "retired"; that restitution to the victim was ordered; and that her case officer "may furlough [the Defendant] to in-patient treatment." According to the trial court, the Defendant had previously violated the conditions of this sentence and was ordered to serve three-hundred and sixty-five days, "day-for-day," in incarceration. She was released from jail on May 13, 2015.

Apparently, while incarcerated on this prior violation in case number 60-2013, the Defendant entered a guilty plea to burglary other than habitation in case number 540-2014. She received a four-year sentence as Range II, multiple offender, to be served on community corrections. Service of this sentence was ordered to be served consecutively to the effective eight-year sentence in case number 60-2013.

On July 14, 2015, a violation of community corrections affidavit was filed, which listed both case numbers and provided a sentence term of twelve years. It was alleged in the affidavit that the Defendant violated the conditions of her sentence by failing "to remain on house arrest as instructed by her [c]ase [o]fficer," failing "to maintain employment," and failing "to remain current on her court costs and fines." A warrant was issued for the Defendant's arrest, and a revocation hearing followed.

At the hearing, Katelyn McGuire testified that she supervised the Defendant following her release from incarceration on May 13, 2015.[2] According to Ms. McGuire, during the first ninety days of her release, the Defendant was on "Level 1" supervision, which included "a minimum" of ninety days' "house arrest." Ms. McGuire testified that the Defendant missed five home visits from May 14 until July 15. The first missed visit occurred on May 14—the day after the Defendant was released from jail. While there were allowable reasons to leave the residence, such as going to work, attending doctors' appointments, or performing community service work, these exceptions did not apply in the Defendant's case, according to Ms. McGuire.

Ms. McGuire further stated that the Defendant was in violation of the conditions of her sentence because she had failed to maintain employment and because she "failed to pay her costs and that sort of thing." According to Ms. McGuire, the Defendant "was employed through Crown in Portland, Tennessee" from June 3 through June 10, 2015, but she voluntarily quit that job, providing as the reason "that they didn't want her missing for doctors['] appointments."

---

[2] Prior to her incarceration, the Defendant had been supervised by a different case officer, but that officer no longer worked for the Community Corrections Program.

-2-

On cross-examination, Ms. McGuire stated that she explained the terms of house arrest to the Defendant, including that the Defendant could only leave the residence upon receiving prior approval. The Defendant did notify Ms. McGuire of two doctors' appointments that she attended at "Mid-Cumberland" for liver issues. However, on several other occasions, the Defendant notified Ms. McGuire only after she had left the residence. Ms. McGuire said that she reviewed the order placing the Defendant on house arrest with the Defendant, that she made it clear to the Defendant that she was required to obtain permission before leaving, and that it was not possible that the Defendant understood this as simply "a notice requirement."

Ms. McGuire admitted that the Defendant contacted her frequently and would leave voicemail messages stating her intention to leave the house, although those messages were often left after hours, according to Ms. McGuire. However, Ms. McGuire clarified that the Defendant had to obtain permission during office hours and that the Defendant was informed of this requirement.

Regarding the Defendant's efforts at seeking employment, Ms. McGuire acknowledged that the Defendant "made numerous trips back and forth to Aspire Staffing," although she never successfully obtained further employment after working for Crown. When asked about the Defendant's payment of court fees, Ms. McGuire did not have the "exact" information "in front of [her]," but she opined that, while the Defendant did make one payment, "she was behind from previous court costs and fines." According to Ms. McGuire, the Defendant's monetary troubles stemmed from her lack of gainful employment.

The Defendant expressed an interest in drug treatment to Ms. McGuire, and together, they filled out paperwork for a treatment program called "Mending Hearts." The Defendant was supposed to have a face-to-face meeting for that program the day she was incarcerated on the present violation warrant.

On redirect examination, Ms. McGuire affirmed that the Defendant had previously been placed in the Community Corrections Program and opined that the Defendant, therefore, was familiar with the rules of house arrest, including not leaving voicemail messages after hours. Moreover, Ms. McGuire found the Defendant's request for drug treatment "a little bit suspicious" because the Defendant was not "failing drug screens."

The trial court questioned Ms. McGuire, asking if the Defendant had obtained Ms. McGuire's permission prior to leaving on any of these five missed home visits, if the Defendant had attempted to notify Ms. McGuire after the fact, or if the Defendant had left Ms. McGuire voicemail messages on these dates. Ms. McGuire responded negatively on all counts. When asked if she spoke to the Defendant about these missed visits, Ms.

McGuire replied that she had, and that the Defendant indicated to her that she understood the rules of house arrest, but that "[i]t just continued to happen."

The Defendant testified on her own behalf at the revocation hearing. She stated that her prior case officer allowed her to leave voicemail messages about leaving the house, that she did not have to get permission, and that she "figured that would be the same way" with Ms. McGuire. The Defendant affirmed that Ms. McGuire explained the rules of house arrest to her but she "[o]bviously" misunderstood them, which she attributed to "learning disabilities or difficulties understanding instructions" and having only completed the ninth grade. However, she agreed that there were only a limited number of reasons she was permitted to leave the house.

According to the Defendant, Ms. McGuire did not explain the rules of house arrest "well enough" but simply provided her with the "rule book," which the Defendant read herself. The Defendant said that Ms. McGuire "really explained" the rules for the first time "face-to-face" in July, just shortly before her arrest.

Additionally, the Defendant claimed that she called Ms. McGuire every time that she left the house and left voicemail messages as to her whereabouts. The Defendant acknowledged that these calls and messages took place after office hours. According to the Defendant, she never knowingly violated the rules of house arrest, believing that she "had up to three chances to miss home visits" before she would be violated. The Defendant also asserted that Ms. McGuire never informed her that she had missed home visits on five occasions. Because she had left to visit her husband on one occasion, however, the Defendant knew she had missed that visit.

Regarding her request for drug treatment, the twenty-four-year-old Defendant claimed that she had been a drug addict for the past five years, using intravenous drugs, and that she needed "rehab" to deal with her drug problem. The Defendant claimed that she had been denied "rehab" on all of her previous requests. However, the Defendant admitted that she had received treatment once at the age of nineteen, but she had only completed two weeks of the year-long program. She left the program early due to her anger issues. According to the Defendant, "jail [was] not helping" her with her drug addiction.

Turning to the issue of her failure to maintain employment, the Defendant stated that she had to quit working at Crown because of medical reasons and was looking for a "night shift job" so she could keep her daytime appointments. She missed two days of work at Crown due to doctors' appointments, and her boss was not understanding of her absences, saying that she "didn't meet their standards." According to the Defendant, she had frequent doctors' appointments for Hepatitis C treatment and counseling. The Defendant listed several other places she had applied for employment, albeit

-4-

unsuccessfully. According to the Defendant, Ms. McGuire was aware of her efforts, but Ms. McGuire reiterated the need for the Defendant to obtain employment.

The Defendant claimed that she had made payments of $20 and $45 towards her "court fines." She believed that she was "current" in her repayment obligations.

The Defendant admitted that she used drugs while she was released on house arrest by "shooting meth and heroine," using "[e]very day, two or three times a day." The Defendant was given two or three drug tests during her supervision, but she admitted that those test results were "[c]lean." She explained that she would "binge" for two or three days after seeing her case officer and then "have four or five days to get clean" before the next meeting. She expressed her "sincere[]" desire for drug treatment in a long-term program.

On cross-examination, the Defendant's previous unsuccessful attempt at in-patient drug treatment at nineteen years of age was discussed, including that she only asked for help after "test[ing] hot" on the first day of probation, that she wanted to leave treatment after four days, and that she did in fact later leave. The Defendant also did not inform her probation officer in February 2011 that she had an assessment with Bradford Health Services, and she did not follow through with setting up that treatment.

The Defendant was asked, "How many times over the course of your probation and [c]ommunity [c]orrections have these rules been explained to you?" and she replied, "State and Community Corrections is [sic] different rules." The Defendant was also specifically asked about the missed home visit on July 9. The Defendant admitted that she left her home despite the fact that Ms. McGuire denied her request and that she did so because she wanted to see her husband who she "hadn't seen . . . in four years."

Based upon this proof, the trial court concluded that the Defendant had violated the terms of her community corrections sentence and revoked the concurrent, eight-year sentences in case number 60-2013. The trial court made the following determination in so ruling:

> [W]e have a situation here where crimes continue to be committed by the [D]efendant, and we give her opportunities to stay out of the penitentiary and to maybe try to help her, but she doesn't really seem to care.
> I think the best example, . . . is when you called and asked to go see your boyfriend and you couldn't go and you missed the home visit. You knew what the rules were, and I don't believe you otherwise.
> I really don't know if you were using as much as you said you were because you tested negative all these times that you said that you were using. You are not truthful and can't be believed, especially in light of the

fact where you blame Ms. McGuire for not telling you the rules. . . . You are responsible.

Now, . . . we put you on [c]ommunity [c]orrections, and you just went out, flat out, and disobeyed a request in one of these five visits.

Furthermore, the trial court stated that it could not "revoke the four-year sentence [in case number 540-2014] because she ha[d] not committed a crime," reasoning that it could only "do that had she committed a crime."[3] The trial court ordered that, when the Defendant was released from incarceration, she was "to be assessed for any drug issues," and if deemed necessary, she would then receive some form of drug treatment. The Defendant perfected a timely appeal from the trial court's ruling.

ANALYSIS

The Defendant asserts that the evidence presented at the revocation hearing was insufficient to support the trial court's decision to revoke her community corrections sentence and that the trial court abused its discretion accordingly. The Defendant also submits that trial counsel denied her due process by failing to call the Defendant's mother at the revocation hearing.[4]

The Tennessee Supreme Court has held that the same principles that apply in the revocation of probation also apply in the revocation of community corrections. State v. Harkins, 811 S.W.2d 79, 83 (Tenn. 1991). The revocation of community corrections, like the revocation of probation, rests within the sound discretion of the trial court. Id. An appellate court will uphold a trial court's decision to revoke probation or community

---

[3] Based upon the trial court's ruling in this regard, we feel constrained to note that a behavioral contract setting forth the conditions of a community corrections sentence makes no distinction between what is commonly referred to as a "technical" violation versus a "non-technical" violation (commission of a crime). See State v. Mark Griffis, No. 03C01-9708-CR-00358, 1998 WL 712702, at *2 (Tenn. Crim. App. Oct. 13, 1998); see also State v. Steven E. Smith, No. E2001-02892-CCA-R3-CD, 2002 WL 31819128, at *2 (Tenn. Crim. App. Dec. 16, 2002) (providing an example that a violation of probation may be based solely on a "technical violation" of any lawful condition imposed). "In plain language, a violation irrespective of its nature remains a violation." Id. Moreover, the law is clear that "[i]t is of no consequence that revocation occurred prior to the commencement of the probationary term. Any other conclusion would allow a defendant to commit indiscriminate criminal acts between the grant of probation and the commencement of the probationary term without consequence." State v. Karen Jo Williams, No. M2012-02043-CCA-R3-CD, 2013 WL 3128652, at *6 (Tenn. Crim. App. June 19, 2013) (quoting State v. Israel Allen Jackson, No. M2005-00365-CCA-R3-CD, 2005 WL 3038613, at *2 (Tenn. Crim. App. Nov. 9, 2005)) (internal quotations marked omitted). See also State v. Conner, 919 S.W.2d 48, 50 (Tenn. Crim. App. 1995); State v. Stone, 880 S.W.2d 746, 748 (Tenn. Crim. App. 1994). However, this issue is not before us for review in this appeal.

[4] The Defendant is represented by a different attorney on appeal.

corrections absent an abuse of discretion.  State v. Beard, 189 S.W.3d 730, 735 (Tenn. Crim. App. 2005); State v. Webb, 130 S.W.3d 799, 842 (Tenn. Crim. App. 2003) (quoting Harkins, 811 S.W.2d at 82).

Pursuant to Tennessee Code Annotated section 40-35-311(e), the trial court is required only to find that the violation of a community corrections sentence occurred by a preponderance of the evidence.  Once there is sufficient evidence to establish a violation of a community corrections sentence, the trial court has the authority to revoke the community corrections sentence.  Tenn. Code Ann. § 40-36-106(e).  The trial court may then "resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration."  Tenn. Code Ann. § 40-36-106(e)(4).

The Community Corrections Program was created as an alternative to incarceration that provides flexibility and promotes accountability, while reducing the number of "nonviolent felony offenders" in the state prison system.  Tenn. Code Ann. § 40-36-104; see also State v. Estep, 854 S.W.2d 124, 126-27 (Tenn. Crim. App. 1992) ("[T]he community corrections sentence provides a desired degree of flexibility that may be both beneficial to the defendant yet serve legitimate societal purposes.").  While the program provides defendants with freedom that would otherwise be removed if the defendant had been incarcerated, there are specific remedies available to the trial court to ensure that those who fail to comply with the program are sufficiently penalized for their noncompliance.  Tenn. Code Ann. § 40-36-106(e)(4).

The Defendant contends that the trial court erred by determining that she violated the conditions of her sentence by failing to remain on house arrest, failing to maintain employment, and failing to remain current on her court costs and fines.  However, the trial court's ruling was based solely on the Defendant's violation of the rules of house arrest, which also incorporated therein a finding that her testimony was not credible.  Accordingly, we will only address whether sufficient evidence supports the trial court's conclusion that the Defendant failed to comply with the rules of house arrest.

The Defendant asserts in her brief that "evidence was never presented as to how long [her] house arrest was in effect or as to whether the dates on which she was allegedly not present for home visits occurred during such."  She claims that the record establishes she was released from incarceration after her January 15, 2015 plea and that "her alleged house arrest violations occurred between May and July 2015, well after the 'minimum of [ninety] days' for Level 1."  The Defendant also contends that she understood she could leave the house for "a legitimate purpose if she left a voice mail message for [Ms. McGuire] explaining such."

However, Ms. McGuire's testimony clearly established the contrary. Ms. McGuire specifically stated that she started supervising the Defendant after the Defendant's release from jail on May 13, 2015, following incarceration for a previous violation. Ms. McGuire testified that the Defendant was required to be on house arrest for "a minimum" of ninety days thereafter. Ms. McGuire said that she reviewed the order placing the Defendant on house arrest with the Defendant and that the Defendant was advised that obtaining advance permission to leave the residence was mandatory. The Defendant was not home on five specific dates between May 14 and July 15, 2015. Ms. McGuire stated that the Defendant left on those dates without permission, that the Defendant never informed her after the fact, and that the Defendant never left voicemail messages on any of those occasions.

The trial court accredited Ms. McGuire's testimony that she informed the Defendant of the rules of house arrest, noting the Defendant's baseless attempts to shift the blame to Ms. McGuire. Furthermore, the trial court did not accredit the Defendant's testimony that her violations were due to an honest misunderstanding because her previous case officer allowed such behavior. The Defendant bizarrely claimed that she believed she could be absent three times during home visits before she would be violated. She thereafter admitted to leaving her home, in the face of an express denial of permission by Ms. McGuire, to go visit her husband. The trial court also did not believe the Defendant's claims of frequent drug usage while on release given her "[c]lean" drug tests. The trial court noted that the Defendant had been given repeated chances to comply with the conditions of a sentence involving release.

The record clearly supports the trial court's conclusion that the Defendant violated this condition of her community corrections supervision by being absent from her home on five occasions without permission. We conclude that the trial court, pursuant to its discretionary authority, properly revoked the Defendant's community corrections sentence and ordered her to serve her concurrent, eight-year terms in confinement. See Tenn. Code Ann. § 40-36-106(e)(4).

As a separate issue, the Defendant claims that trial counsel "improperly failed to call [the Defendant's] mother as a witness" at the revocation hearing, thereby constituting a violation of her right to due process of law. A defendant at a revocation proceeding is not entitled to the full array of procedural protections associated with a criminal trial. See Black v. Romano, 471 U.S. 606, 613 (1985); Gagnon v. Scarpelli, 411 U.S. 778, 786-90 (1973). However, such a defendant is entitled to the "minimum requirements of due process," including: (1) written notice of the claimed violation(s); (2) disclosure of the evidence against him or her; (3) the opportunity to be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless good cause is shown for not allowing confrontation); (5) a neutral and

detached hearing body, members of which need not be judicial officers or lawyers; and (6) a written statement by the fact-finder regarding the evidence relied upon and the reasons for revoking probation. Gagnon, 411 U.S. at 786; Morrissey v. Brewer, 408 U.S. 471, 489 (1972).

In her brief, the Defendant claims that her mother, who was present in the courtroom, "should have been called as a witness to testify on her behalf as a character witness and as to her request for rehabilitation rather than incarceration." However, the Defendant clearly had the right to present witnesses on her own behalf at the revocation hearing. The Defendant's claim, on its face, therefore, is one of ineffective assistance of counsel.

Our supreme court has held that "the issue of ineffective assistance of counsel in a revocation of a community corrections sentence may be raised in a post-conviction proceeding." Carpenter v. State, 136 S.W.3d 608, 612 (Tenn. 2004); see also Anthony L. Grant, Jr. v. State, No. M2007-00052-CCA-R3-PC, 2008 WL 4169985, at *4 (Tenn. Crim. App. Sept. 8, 2008) (holding that that "the trial court need not 'resentence' a defendant—i.e., extend the length of the defendant's sentence—upon revoking a defendant's community corrections sentence for the defendant to have the right to file a post-conviction petition"). However, this court has repeatedly warned that "the practice of raising ineffective assistance of counsel claims on direct appeal is 'fraught with peril' since it 'is virtually impossible to demonstrate prejudice as required' without an evidentiary hearing." State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of . . . what a witness's testimony might have been if introduced by defense counsel." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We do not know what the Defendant's mother's testimony would have been, and the Defendant, therefore, has failed to establish any deficiency or prejudice. The Defendant is not entitled to relief.

CONCLUSION

In sum, we conclude that the trial court did not abuse its discretion by partially revoking the Defendant's community corrections sentence and by ordering her to serve the balance of her eight-year sentences in confinement. Accordingly, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE